# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-04-00683-CV
---

**Save Our Springs Alliance, Inc., Appellant**

**v.**

**City of Dripping Springs; Todd Purcell, in his Official Capacity as Mayor of the City of Dripping Springs; and Mak Foster Ranch, L.P., Appellees**

---
**FROM THE DISTRICT COURT OF HAYS COUNTY, 207TH JUDICIAL DISTRICT NO. 02-1748, HONORABLE JACK H. ROBISON, JUDGE PRESIDING**
---

## O P I N I O N

The City of Dripping Springs entered into agreements with two landowners in the City's extraterritorial jurisdiction, Cypress-Hays, L.P. and Mak Foster Ranch, L.P. The agreements contemplated the landowners' development of portions of their property for residential, commercial, and recreational use. The agreements were approved by the city council in public meetings during April 2001. Appellant Save Our Springs Alliance, Inc. ("SOS Alliance") filed suit alleging that the agreements would result in added pollution to the environmentally sensitive Edwards Aquifer. In its petition, SOS Alliance sought a declaration that the agreements violated the Texas Constitution, and alleged that the public notices regarding the city council's approval of the agreements did not sufficiently communicate the subject matter of the meetings as required by the Texas Open Meetings Act. The district court granted summary judgment to the defendants on SOS Alliance's Open Meetings Act claim, granted the defendants' pleas to the jurisdiction on the remaining claims

based on SOS Alliance's lack of standing, and awarded the defendants attorneys' fees. We affirm the judgment of the district court.

*Factual and Procedural Background*

After notice and a public hearing on April 10, 2001, the City of Dripping Springs entered into a "Development Agreement" with Cypress-Hays, L.P. This agreement authorized development on approximately 2,724 acres of land owned by Cypress-Hays in the City's extraterritorial jurisdiction in Hays County. After notice and a public hearing on April 19, 2001, the City entered into a similar "Development Agreement" with Mak Foster Ranch, L.P. This agreement authorized development on approximately 1,611 acres of land owned by Mak Foster in the City's extraterritorial jurisdiction in Hays County. Both Development Agreements contemplated development of the land as master-planned, mixed-use communities with commercial and residential uses, as well as park and recreational facilities. Under the Agreements, Cypress-Hays and Mak Foster could develop the land according to agreed-upon standards, in exchange for the City's pledge that the standards would remain consistent for a period of 15 years (with up to two 5-year extensions).[1]

---

[1] Given that SOS Alliance's interests against the Development Agreements spring from environmental concerns, we note that the Agreements contain several environmental-protection provisions, requiring the developers to (1) comply with applicable state rules "designed to protect the quality of the Edwards Aquifer," (2) obtain and comply with any required "no-discharge" permits regarding treated sewage effluent, (3) comply with any U.S. Army Corps of Engineers authorizations under section 404 of the federal Clean Water Act, (4) prepare and implement a "stormwater pollution prevention plan," (5) ensure no adverse effect on listed endangered species or their critical habitat in accordance with the federal Endangered Species Act, and (6) implement certain voluntary environmental protection measures, including an integrated pest management program at any golf course, education of property owners, and buffering of sensitive drainage areas.

SOS Alliance is a nonprofit corporation dedicated to protecting the Barton Springs segment of the Edwards Aquifer, which is located almost entirely in Hays and Travis Counties. According to SOS Alliance, water from the aquifer's "contributing zone," in which the City of Dripping Springs is located, flows eastward on creeks into the "recharge zone," where the water moves underground through caves, sinkholes, and other openings to fill or "recharge" the aquifer. Most of the water from this segment of the aquifer emerges at Barton Springs in Austin, Texas, which is on the northeast corner of the two zones.

In November 2002, SOS Alliance filed suit against the City of Dripping Springs and Todd Purcell in his official capacity as mayor of the City of Dripping Springs (collectively, the "City"), challenging the municipality's authority to enter into the Development Agreements and the sufficiency of the information in the public notices for the meetings at which the Agreements were considered and approved.[2] Four months later, SOS Alliance added Cypress-Hays and appellee Mak Foster as defendants in the lawsuit.

Although some authority existed for cities to enter into certain types of development agreements for land in their extraterritorial jurisdiction, *see* Tex. Loc. Gov't Code Ann. § 42.044 (West 2008), the legislature expanded cities' authority to enter into such agreements during the 2003 legislative session. *See* Act of May 24, 2003, 78th Leg., R.S., ch. 522, § 1, 2003 Tex. Gen. Laws 1788, 1788-89 (codified at Tex. Loc. Gov't Code Ann. §§ 212.171-.174 (West 2008)). The

---

[2] During the same time period, another organization, Friendship Alliance, filed suit against the City challenging the legality of the Development Agreements. The two lawsuits were consolidated in early 2003. Friendship Alliance settled its lawsuit in 2004 after certain amendments to the Agreements had been negotiated.

2003 legislation included a provision that resulted in the retroactive validation of the Development Agreements. *See* Tex. Loc. Gov't Code Ann. § 212.172(h) (West 2008).

After this legislation was enacted, on May 11, 2004, SOS Alliance filed its second amended petition—the live pleading in this case when judgment was entered—seeking declaratory and injunctive relief and attorneys' fees. In its petition, SOS Alliance alleged that the Development Agreements violate the Texas Constitution by impinging on the right of local self-government, impairing the preservation of a republican form of government, and contracting away legislative powers. SOS Alliance further alleged that the City violated the Texas Open Meetings Act by issuing public notices that insufficiently stated the subject of the Development Agreements.

The parties filed cross-motions for partial summary judgment, and the defendants also filed pleas to the jurisdiction challenging SOS Alliance's standing to pursue its claims. On July 26, 2004, the district court granted the defendants' pleas to the jurisdiction as to all of SOS Alliance's claims except the alleged violations of the Open Meetings Act and, after a hearing, granted summary judgment in favor of appellees as to the Open Meetings Act claim. The parties and the court agreed to try the remaining issue of attorneys' fees on written submission, and the court subsequently granted the defendants' requested fees. The district court entered a final judgment on November 29, 2004, incorporating all of its prior orders. SOS Alliance appeals.[3]

---

[3] SOS Alliance has dismissed its claims against Cypress-Hays, which is no longer a party to this case. *See Save Our Springs Alliance v. City of Dripping Springs*, No. 03-04-00683-CV (Tex. App.—Austin Dec. 7, 2007) (per curiam) (order). Also, on April 27, 2007, this Court issued an order staying the appeal due to SOS Alliance's declaration of bankruptcy. On September 15, 2008, on the motion of appellee Mak Foster, we reinstated the appeal.

*Standing*

In its first and second points on appeal, SOS Alliance asserts that the district court's granting of appellees' pleas to the jurisdiction as to SOS Alliance's claims that do not relate to the Open Meetings Act was in error. A plea to the jurisdiction challenges the trial court's authority to determine the subject matter of a specific cause of action. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004). We review de novo whether a court has subject-matter jurisdiction and whether the plaintiff has alleged facts that affirmatively demonstrate subject-matter jurisdiction. *Id.* at 226. In deciding a plea to the jurisdiction, we are not to consider the merits of the plaintiff's claims beyond the extent necessary to resolve the jurisdiction issue, but consider the plaintiff's pleadings, construed in the plaintiff's favor, and evidence pertinent to the jurisdictional inquiry. *Id.* at 227-28; *County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002). SOS Alliance contends that its pleadings and jurisdictional evidence are sufficient to establish jurisdiction.

Subject-matter jurisdiction is essential to the authority of a court to decide a case, and standing is a component of subject-matter jurisdiction. *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 443-45 (Tex. 1993). A plaintiff must have standing for the court to have subject-matter jurisdiction to decide the merits of the plaintiff's claims. *See id.*; *Farmers Tex. County Mut. Ins. Co. v. Romo*, 250 S.W.3d 527, 532 (Tex. App.—Austin 2008, no pet.). The plaintiff must allege facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Texas Ass'n of Bus.*, 852 S.W.2d at 446. The general test for standing is whether there is a real controversy between the parties that will actually be determined by the judicial declaration sought.

5

*Id.* Standing focuses on the question of who may bring a lawsuit. *Patterson v. Planned Parenthood*, 971 S.W.2d 439, 442 (Tex. 1998).

SOS Alliance sues on behalf of its members. An association has standing to sue on behalf of its members when (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Texas Ass'n of Bus.*, 852 S.W.2d at 447 (quoting *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). The first prong of associational standing may be satisfied if at least one of the organization's members would have standing individually. *See Hays County v. Hays County Water Planning P'ship*, 106 S.W.3d 349, 357 (Tex. App.—Austin 2003, no pet.). The Supreme Court has observed that the "irreducible constitutional minimum" of individual standing contains three elements: (1) the plaintiff must have suffered an "injury in fact," an invasion of a legally protected interest that is concrete and particularized, and that is actual or imminent rather than conjectural or hypothetical, (2) the injury is fairly traceable to the challenged action of the defendant and not the independent action of a third party not before the court, and (3) it must be likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see Brown v. Todd*, 53 S.W.3d 297, 305 (Tex. 2001) ("[W]e may look to the similar federal standing requirements for guidance.").

SOS Alliance alleges several distinct injuries to its members by which it asserts to have standing in this lawsuit: (1) members who enjoy Barton Springs pool and its surroundings for its recreational, scenic, or scientific value allege injury from increased pollution in the aquifer;

6

(2) members who live near the land subject to the Development Agreements and who use well water express concern of pollution to the water; (3) members who are residents of Dripping Springs allege that the Agreements injured their procedural interests in using democratic means to prevent development activities that would further pollute Barton Springs; (4) members who pay property taxes to the City allege injury from the City's expenditure of public funds under the Agreements; and (5) members who live near the land subject to the Agreements express concern about increased lights during the nighttime, increased road traffic, and decreased property values.

*Injury to Environmental, Scientific, and Recreational Interests in Barton Springs*

SOS Alliance argues that it has standing due to environmental injury related to the Barton Springs pool in Austin. SOS Alliance alleges that many of its members regularly swim in the Barton Springs pool, and many of them enjoy Barton Springs and Barton Creek for other recreational activities and for purposes of observing and contemplating nature. One member claimed that, as a scientist, he has a professional and educational interest in the Barton Springs salamander. SOS Alliance alleges that the Development Agreements will result in an increase in pollution in the aquifer, which will contribute to the declining health of Barton Springs—including the reduction of water quality, plant life, numbers of fish, and population of the Barton Springs salamander—which will in turn injure SOS Alliance's members' "environmental, scientific, and recreational interests." SOS Alliance contends that injury to these types of interests has been "widely recognized" to confer standing.

The Texas cases cited by SOS Alliance to support standing based on environmental harm involve plaintiffs who own property affected by the defendant's actions. In *Lake Medina*

7

*Conservation Society v. Texas Natural Resource Conservation Commission*, an organization sued for review of a state commission's order authorizing a water control and improvement district's diversion of water from a lake. 980 S.W.2d 511, 513-15 (Tex. App.—Austin 1998, pet. denied). This Court held that the organization's members would have standing in their own right because they owned waterfront property, waterfront businesses, and private wells in the area. *See id.* at 515-16. In *Heat Energy Advanced Technology, Inc. v. West Dallas Coalition for Environmental Justice*, an application for a renewal permit for a hazardous and industrial waste storage and processing facility was challenged by a coalition of nearby residents, but the administrative agency determined the coalition did not have standing to participate in the hearing. 962 S.W.2d 288, 289-90 (Tex. App.—Austin 1998, pet. denied). This Court held that the agency erred in its determination, concluding that the proximity of a member's home to the facility, combined with that member's allegation of odors affecting his breathing, was sufficient to confer standing. *See id.* at 295.

SOS Alliance also relies on this Court's opinion in *Texas Rivers Protection Ass'n v. Texas Natural Resource Conservation Commission*, 910 S.W.2d 147 (Tex. App.—Austin 1995, writ denied). In that case, a state commission granted a permit for the diversion of water from the Guadalupe River, despite a challenge by the Texas Rivers Protection Association (TRPA) to the application. *See* 910 S.W.2d at 150-51. On appeal, the party to whom the permit was issued challenged the TRPA's standing to seek judicial review of the permit. *See id.* at 151-52. A member of TRPA owned property fronting the affected area of the river and testified that the diversion of water would injure his "aesthetic and recreational interests in the river." *Id.* at 151. This Court stated, "An injury need not affect 'vested' property rights to confer standing; the harm may be

8

economic, recreational, or environmental." *Id.* at 151-52. SOS Alliance contends that because its members have alleged recreational and environmental harm, it has shown a sufficient injury in fact for purposes of standing. However, this Court's view of the type of harm that can constitute an injury in fact for purposes of standing in *Texas Rivers* was coupled with the determination that the TRPA member's "riparian ownership alone sufficiently distinguishes [his] injury from that of the public at large." *Id.* at 151.

The *Texas Rivers* case, therefore, does not stand for the proposition that an allegation of any type of recreational or environmental impact, by itself, constitutes an injury in fact sufficient to confer standing. Instead, this Court in *Texas Rivers* concluded that while environmental harm may be a cognizable injury for purposes of standing, it was the harm to the plaintiff's riparian interests that made the injury sufficiently particularized so as to distinguish the harm from that experienced by the general public. *See id.* at 151-52; *Brown*, 53 S.W.3d at 302 ("Our decisions have always required a plaintiff to allege some injury distinct from that sustained by the public at large."). In sum, we do not find any Texas case in which an alleged injury to a plaintiff's environmental, scientific, or recreational interests conferred standing in the absence of allegations that the plaintiff has an interest in the property affected by the defendants' actions.

Lacking a member with a property interest in Barton Springs (the land alleged to be polluted as a result of the Development Agreements contrary to SOS Alliance members' environmental, scientific, or recreational interests), SOS Alliance turns to federal case law to support its assertion of environmental standing. SOS Alliance is correct that federal courts have recognized that environmental harm can constitute a cognizable injury for purposes of constitutional standing.

9

*See Sierra Club v. Morton*, 405 U.S. 727, 734 (1972) ("We do not question that this type of harm [to scenery, natural and historic objects, and wildlife of a national park] may amount to an 'injury in fact' sufficient to lay the basis for standing . . . ."). Moreover, federal courts have found standing for this type of harm in the absence of the plaintiff possessing a property right where harm occurs. Under federal case law, environmental plaintiffs adequately allege a particularized injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183 (2000). SOS Alliance contends that we should follow the federal courts' lead on this issue by determining that SOS Alliance's members' environmental interests are particularized, legally protected interests, even in the absence of ownership of property impacted by the environmental harm. *See Texas Ass'n of Bus.*, 852 S.W.2d at 444 ("Because standing is a constitutional prerequisite to maintaining a suit under both federal and Texas law, we look to the more extensive jurisprudential experience of the federal courts on this subject for any guidance it may yield.").

However, the federal cases cited by SOS Alliance, in which environmental harm is held to constitute an injury in fact for purposes of standing, involve the application of federal environmental-protection statutes that prohibited the types of conduct alleged by the plaintiffs in those cases to have occurred. The majority of the federal cases cited by SOS Alliance to demonstrate that an injury in fact for purposes of standing may be environmental involve claims

10

under the federal Clean Water Act (CWA).[4] *See* 33 U.S.C. § 1251 *et seq* (2001). The CWA itself provides for a private right of action. A suit to enforce an effluent standard or limitation under the CWA may be brought by any "citizen," which is defined as "a person or persons having an interest which is or may be adversely affected." *Id.* § 1365(a), (g). This provision "confers standing to enforce the Clean Water Act to the full extent allowed by the Constitution." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 152 (4th Cir. 2000). In these cases, then, the plaintiffs possessed a legally protected interest for purposes of standing by virtue of a federal statute. *See id.* at 156-57 ("injury required by Article III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing" (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975))).[5]

The few federal cases cited by SOS Alliance not involving the CWA—which has a citizen-enforcement provision—also involved environmental-protection statutes. In *Cantrell*

---

[4] *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 173 (2000); *American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 509 (4th Cir. 2003); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 153 (4th Cir. 2000); *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 553 (5th Cir. 1996), *cert. denied*, 519 U.S. 811 (1996); *Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, 1111-12 (4th Cir. 1988), *cert. denied*, 491 U.S. 904 (1989); *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 900 F. Supp. 67, 70 (E.D. Tex. 1995).

[5] SOS Alliance asserts that section 26.177 of the Texas Water Code "articulates standing rights at least as broad as the standing granted under the federal Clean Water Act." Section 26.177 authorizes "[a]ny person affected by any ruling, order, decision, ordinance, program, resolution, or other act of a city relating to water pollution control and abatement outside the corporate limits of such city" adopted pursuant to statute to appeal such action to district court. Tex. Water Code Ann. § 26.177(d) (West 2008). However, such a lawsuit must be filed within 60 days of the challenged act of the city. *See id.* Regardless of whether section 26.177 could apply to SOS Alliance and would provide standing as broad as the CWA, SOS Alliance does not allege that it satisfied the 60-day requirement. The Development Agreements were approved in April 2001. This lawsuit was filed in November 2002. SOS Alliance has not asserted any claims under section 26.177, nor could it have. Moreover, SOS Alliance does not allege any other statute on which its standing to assert its claims not related to the Open Meetings Act might be based.

11

*v. City of Long Beach*, 241 F.3d 674 (9th Cir. 2001), for example, the Ninth Circuit concluded that the plaintiffs sufficiently alleged an injury in fact for constitutional standing purposes in that they "observed and enjoyed" endangered birds that could be evicted by the defendants' actions. 241 F.3d at 679-82. Prior to reaching this conclusion, the court addressed whether the alleged injury was within the zone of interests protected by the statute at issue, the National Environmental Policy Act. *Id.* at 679. Since that statute did not provide a private right of action for violations of its provisions, the plaintiffs brought their action under the federal Administrative Procedure Act, *see id.* at 679 n.2, which provides that a person suffering legal wrong because of agency action is entitled to judicial review, *see* 5 U.S.C. § 702 (2007). To have standing to file such a suit, the plaintiffs were required not only to show constitutional standing under Article III—injury in fact, traceability, and redressability—but also to satisfy the "zone-of-interests" test. *See Morton*, 405 U.S. at 732-33; *Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 447-48 (10th Cir. 1996). In addition to the constitutional elements of standing as interpreted by the Supreme Court, federal courts have also developed "prudential standing requirements" to ensure that the judiciary does not issue advisory opinions. One of these elements is the zone-of-interests test, which requires that when a plaintiff sues to enforce a statute, the plaintiff's alleged injury must fall within the zone of interests that the statute was designed to protect. *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 883 (1990). The goal of this prudential-standing requirement is to determine whether the plaintiff is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers. *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 560 (5th Cir. 2001) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 546 n.8 (1986)).

The federal law sought to be enforced in *Cantrell* included a federal policy to "preserve important historic, cultural, and natural aspects of our national heritage." 241 F.3d at 679 (quoting 42 U.S.C. § 4331(b)(4) (2003)). Consequently, the defendant in *Cantrell* did not dispute that the plaintiff-birdwatchers' interest in "preserving the historic buildings and natural environment" satisfied the zone-of-interests requirement. *Id.* Given federal courts' application of a zone-of-interests test, it makes sense that the non-CWA, federal cases cited by SOS Alliance, in which environmental harm was alleged and found sufficient to confer standing, involved challenges based on federal environmental statutes. A direct relationship between the environmental law and the environmental harm alleged would likely satisfy the zone-of-interests test.

Texas courts have not applied the federal "zone of interests" standing requirement that is utilized in the context of an Administrative Procedure Act claim. *But see In re Houston Chronicle Publ'g Co.*, 64 S.W.3d 103 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (applying zone-of-interests test to a federal constitutional claim). We need not, however, determine whether Texas standing jurisprudence incorporates a zone-of-interests requirement.[6] Instead, we must

---

[6] We note that this Court's holding in *Texas Rivers* that harm for purposes of standing may be "economic, recreational, or environmental" appears to be connected to the federal zone-of-interests test. The Texas case from which the "economic, recreational, or environmental" language originates is *Housing Authority of Harlingen v. State* in its general statement of the test for standing. 539 S.W.2d 911, 913-14 (Tex. Civ. App.—Corpus Christi 1976, writ ref'd n.r.e.). As authority for the language, the court in *Housing Authority of Harlingen* cited several United States Supreme Court opinions, and appears to have taken its description of the scope of an injury in fact from *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150 (1970). In that case, the Supreme Court observed that the interest at issue for purposes of the zone-of-interests test may reflect "aesthetic, conservational, and recreational" as well as economic values. 397 U.S. at 153-54. Thus, the Supreme Court opinion from which Texas courts have borrowed their recognition that an injury in fact may be recreational or environmental made its observation in the context of the federal zone-of-interests test.

13

address whether SOS Alliance has established standing under Texas law to pursue its claims under the Uniform Declaratory Judgments Act (UDJA). *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 2008). Under the UDJA, SOS Alliance must establish standing by alleging an injury in fact to a protected legal right. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555-56 (Tex. 2000) (as general rule, standing requires interest distinct from general public, unless standing conferred by statute); *Texas Ass'n of Bus.*, 852 S.W.2d at 444 (UDJA "merely a procedural device for deciding cases already within a court's jurisdiction rather than a legislative enlargement of a court's power"); *Frasier v. Yanes*, 9 S.W.3d 422, 427 (Tex. App.—Austin 1999, no pet.) ("A declaratory judgment declares the rights and duties or the status of parties in a justiciable controversy.").

There is no Texas authority for the proposition that the type of injury alleged by SOS Alliance in this case—injury to its members' environmental, scientific, and recreational interests generally and without any interest in or connection to the real property involved—is the type of interference with a protected legal right or injury that confers standing as a matter of state law. SOS Alliance must show a particularized, legally protected interest that is actually or imminently affected by the alleged harm. *See Defenders of Wildlife*, 504 U.S. at 560-61. SOS Alliance has alleged neither an environmental interest provided for or protected by statute (as is present in the federal cases cited by SOS Alliance) nor a property interest subject to the recreational or environmental harm (as is present in the state cases cited by SOS Alliance). Absent such allegations, there is no particularized, legally protected interest at stake in this context, as there is nothing to distinguish the environmental, scientific, or recreational concerns of SOS Alliance's members

14

from the same concerns experienced by the public in general. *See id.* at 560; *Nobles v. Marcus*, 533 S.W.2d 923, 927 (Tex. 1976). Therefore, we decline to conclude that the environmental, scientific, and recreational interests asserted by SOS Alliance result in a "concrete and particularized" injury in fact, as is necessary to establish standing under Texas law.[7]

*Injury to Landowners' Well Water*

SOS Alliance also bases its assertion of standing on its members' concern about pollution to their residential water use. SOS Alliance relies on the affidavits of two members who use well water for residential use. One member alleges that he lives "about one-quarter mile" west of the Cypress Hays land and is "concerned" about "pollution from Cypress' proposed golf courses and other development," and the other member alleges that she lives "within the extraterritorial jurisdiction of the City of Dripping Springs," owns an undeveloped residential lot "within 200 feet"

---

[7] SOS Alliance contends that this conclusion ignores SOS Alliance's "long and proud history" of obtaining standing to challenge government actions. SOS Alliance relies on *Save Our Springs Alliance, Inc. v. Lowry*, 934 S.W.2d 161 (Tex. App.—Austin 1996, orig. proceeding), as indicative of such standing. However, that case involved standing based on a statute—the Texas Open Meetings Act. *See* 934 S.W.2d at 162. That Act authorizes an "interested person" to file suit. *See* Tex. Gov't Code Ann. § 551.142(a) (West 2004). According to *Lowry*, this statutory provision dispenses with the standing requirement of an injury distinct from that of the general public. *Lowry*, 934 S.W.2d at 163.

Similarly, the San Marcos River Foundation (SMRF) filed a letter brief as amicus curiae, expressing its concern that a determination in this case that SOS Alliance does not have standing based on environmental harm would impair SMRF's future ability to litigate. We note that in *City of San Marcos v. Texas Commission on Environmental Quality*—by which, SMRF asserts, it was successful in protecting the San Marcos River—a statute specifically authorized judicial review. 128 S.W.3d 264, 266 (Tex. App.—Austin 2004, pet. denied) (citing Tex. Water Code Ann. § 5.351 (West 2000)). Thus, our adjudication of SOS Alliance's standing in the absence of such statutory provision will not likely affect SMRF's future ability to again file suit under the same statute.

15

of the Cypress Hays development, and is "concerned" about "how pollution from a large development in the recharge zone of the Aquifer would [a]ffect the quality of the Aquifer water." We need not determine whether the members' "concern" about pollution to well water on their property is a sufficiently particularized injury in fact for purposes of standing, because we conclude that SOS Alliance has failed to demonstrate that the alleged harm is actual or imminent, rather than hypothetical or conjectural.

To have standing, SOS Alliance must allege an injury that is "actual or imminent, not hypothetical." *See DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304-05 (Tex. 2008). The two members concerned about pollution to their water supply do not allege any connection between the Development Agreements and their well water. Neither member makes any reference to the property subject to the Mak Foster Development Agreement, and the only reference to the Cypress Hays Development Agreement property is one of proximity. According to SOS Alliance's experts' affidavits, the Mak Foster development is located in the contributing zone, the Rutherford Ranch development is located within the "uniquely sensitive" recharge zone, and both will "contribute to the pollution load within wells in the Barton Springs Edwards Aquifer." It is not enough, however, to allege that the Development Agreements will pollute *some* well water in the area and that an SOS Alliance member uses well water in the area. The potential harm to the members' well water must be more than speculative. There must be some allegation or evidence that would tend to show that the well water of the members in question will be affected by the action of which they complain.

16

According to SOS Alliance's experts' affidavits, rainfall on the contributing zone flows east to the recharge zone, where it enters the underground aquifer, and then flows north and mostly resurfaces at the Barton Springs pool. The experts further aver that pollutants from the developments would be added to this run-off into the aquifer, and that there is already evidence of increased pollutants at the Barton Springs pool. Given the specific description contained in SOS Alliance's jurisdictional evidence of the flow direction toward and within the aquifer, there must be evidence in the record to show that the properties of the members who express concern about pollution to their water supply are in a location that is at least potentially "downflow" from the developments. SOS Alliance did not present any allegations or evidence on this point.[8] The fact that the Mak Foster property is somewhere in the contributing zone and an SOS member's well is somewhere in the recharge zone is not, by itself, sufficient to show harm that is imminent and not merely conjectural or speculative. SOS Alliance has failed to allege or provide evidence of any

---

[8] SOS Alliance argues that it should not be required to "hire experts to map and calculate local hydrogeological flows to engage in debates about gradients of flows" at this stage. Whether or not this is the case, SOS Alliance must at least provide evidence that a member "used an area subject to contamination from the discharge." *American Canoe Ass'n*, 326 F.3d at 520. In the cases SOS Alliance cites on this issue, unlike here, there was evidence from which the court could find that the consequences of the challenged action of the defendant would in fact extend to the plaintiff. *See id.* (members' use of river was downstream from polluting defendant); *Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 624, 627 (Tex. 1996) (landowner over Edwards Aquifer challenges constitutionality of statute governing entire aquifer); *City of Canyon v. McBroom*, 121 S.W.3d 410, 415 (Tex. App.—Amarillo 2003, no pet.) (landowner in flood plain complaining of increased risk of flooding); *Lake Medina Conservation Soc'y v. Texas Natural Res. Conservation Comm'n*, 980 S.W.2d 511, 515-16 (Tex. App.—Austin 1998, pet. denied) (owners of lakefront property challenging removal of water from lake); *Texas Rivers Prot. Ass'n v. Texas Natural Res. Conservation Comm'n*, 910 S.W.2d 147, 151 (Tex. App.—Austin 1995, writ denied) (property owners "fronting the affected area of the river" challenging diversion of water from river).

17

actual or imminent impact from the approvals of the Development Agreements on the amount of pollution to SOS Alliance's members' residential water supply.

*Procedural Injury*

SOS Alliance next points to its claims in its pleadings that the Development Agreements violate the Texas Constitution in that they impinge on the right of local self-government (citing Tex. Const. art. I, § 1), impair the preservation of a republican form of government (citing Tex. Const. art. I, § 2), and contract away legislative and police powers (citing Tex. Const. art. I, § 17). According to SOS Alliance, some of its members reside within the city limits of Dripping Springs or its extraterritorial jurisdiction and are opposed to the developments, and their ability to act on their opposition has been eliminated as a result of the Development Agreements' "immediate and certain effect of closing off the democratic process and democratic controls over the development of that tract of property for at least 15 years."

To establish standing to assert these alleged constitutional violations, SOS Alliance must show an injury in fact. *See Neeley v. West Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 774 (Tex. 2005) ("Standing to assert a constitutional violation depends on whether the claimant asserts a particularized, concrete injury."). While SOS Alliance contends that the Development Agreements "adversely and immediately impinge" on its members' constitutional rights, the only injury identified by SOS Alliance is "procedural injury" suffered by those members who reside within the city limits of Dripping Springs or its extraterritorial jurisdiction. SOS Alliance relies on two federal cases for the proposition that injury to its members' procedural interests can be an injury

18

in fact sufficient to show standing—*Sierra Club v. Marita*, 46 F.3d 606 (7th Cir. 1995), and *Natural Resources Defense Council v. Abraham*, 223 F. Supp. 2d 162 (D.D.C. 2002).

In *Marita*, the Seventh Circuit considered a "forest management plan" created by the defendant, a plan with which subsequent natural resource management activities in the covered area had to comply. *See* 46 F.3d at 610-11. The court concluded that, for purposes of standing, there was actual or imminent injury underlying the alleged procedural default even if the plan was not implemented immediately. *See id.* at 612. The court was able to reach this conclusion because, as the Supreme Court has recognized, a plaintiff in federal court does not need to meet the normal standing requirement of imminence when he seeks to assert a procedural right. *See Defenders of Wildlife*, 504 U.S. at 572 n.7. However, for this to apply, the plaintiff must first be accorded the procedural right. *See id.* The National Environmental Policy Act, which the court in *Marita* was construing, *see* 46 F.3d at 612-13, is "essentially a procedural statute," such that "injury alleged to have occurred as a result of violating this procedural right confers standing." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1514 (9th Cir. 1992). Thus, the court in *Marita*, in concluding that the plaintiff had standing based on its procedural interests, was construing a statute that specifically provided for the procedural rights at issue, the violation of which could confer standing.

Likewise, in *Natural Resources Defense Council*, the court's conclusion that the plaintiffs had standing based on procedural injury was in the context of a statute that accorded the plaintiffs specific procedural rights. 223 F. Supp. 2d at 178-79. In that case, the plaintiffs alleged violations of the Federal Advisory Committee Act. *See id.* at 167. According to the court, this federal law established procedural requirements, the requirements were "designed to protect

19

some threatened concrete interest" of the plaintiffs, and the plaintiffs sufficiently alleged harm from the defendant's failure to comply with those procedural requirements. *Id.* at 178-80.

Unlike in *Marita* and *Natural Resources Defense Council*, SOS Alliance does not sue based on a statute that accords SOS Alliance or its members specified procedural rights. SOS Alliance does not provide any argument or authority for the proposition that the constitutional provisions, under which SOS Alliance asserts its claims, provide procedural protections akin to the federal statutes at issue in the two federal cases cited, or that any such procedural protections exist in the absence of a statute that would accrue to the benefit of SOS Alliance or its members. Therefore, we decline to hold that SOS Alliance has standing based on harm to its members' non-specified procedural interests. *See* Tex. R. App. P. 38.1(i); *Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.) ("Failure to cite legal authority or provide substantive analysis of the legal issue presented results in waiver of the complaint.").

### *Taxpayer Standing*

Next, SOS Alliance asserts standing based on the taxpayer status of its members. Taxpayer standing is an exception to the general rule that the plaintiff must show a particularized injury distinct from that suffered by the public. *See Bland Indep. Sch. Dist.*, 34 S.W.3d at 555-56; *Hendee v. Dewhurst*, 228 S.W.3d 354, 373-74 (Tex. App.—Austin 2007, pet. denied). A plaintiff relying on taxpayer standing can seek to enjoin prospective expenditures of public funds, but cannot recover funds already expended. *Williams v. Huff*, 52 S.W.3d 171, 180 (Tex. 2001). To establish taxpayer standing, the plaintiff must show that (1) he is a taxpayer, and (2) public funds are to be expended on the allegedly illegal activity. *Id.* at 179. SOS Alliance alleges that it has at least one

member who resides within the City of Dripping Springs and who pays property taxes on her homestead. SOS Alliance further alleges that the Development Agreements obligate the City to spend money on attorneys' fees defending the Development Agreements from challenges such as this lawsuit.

To show that the City will expend public funds on attorneys' fees, SOS Alliance refers to the Development Agreements' provision that in the event of a third-party lawsuit relating to a Development Agreement, the City and the developer "agree to cooperate in the defense of such suit or claim, and to use their respective best efforts to resolve the suit or claim." This provision, by its plain terms, does not require the expenditure of public funds. It does not address expenditures at all. Rather, a separate provision of the Development Agreements addresses expenditures. That provision requires the developer to pay the City a deposit "intended to cover all City legal . . . fees and administrative expenses" associated with the Agreement. In the event fees and expenses incurred exceed the initial deposit, the developer is obligated to "pay the additional fees and expenses upon the City's request."

We decline to grant taxpayer standing based on expenses that taxpayers will never bear, given the developers' obligation to reimburse the City. SOS Alliance has not shown that any public funds have been or will be expended by the City as a result of the allegedly illegal Development Agreements. Therefore, SOS Alliance has failed to establish taxpayer standing.

*Landowners' Non-Water-Related Concerns*

SOS Alliance also points to its members' concerns about injuries that are distinct from increased pollution to the water entering the aquifer, specifically: (1) increased traffic

21

congestion caused by the new residents of the developments, which in turn might increase traffic safety hazards, (2) increased light interfering with appreciation of nighttime skies, and (3) decreased property value due to the prospect of nearby high-density development. SOS Alliance asserts that it has standing because of these concerns of its members who live near the developments.

Even assuming these members may have standing to sue in their own right, to have associational standing SOS Alliance must show that the interests it seeks to protect are germane to the organization's purpose (the second prong of associational standing). *See Texas Ass'n of Bus.*, 852 S.W.2d at 447. We note that, in this lawsuit, SOS Alliance seeks to protect its members' environmental interests, which *are* germane to its purpose. However, to have associational standing, we conclude that the interest that is "germane to the organization's purpose"—thereby satisfying the second prong—must also relate to the interest by which its members would "have standing to sue in their own right"—thereby satisfying the first prong. *See Hays County v. Hays County Water Planning P'Ship*, 106 S.W.3d 349, 357 (Tex. App.—Austin 2003, no pet.) (association was created to address "these kinds of community issues" by which its members showed standing to sue on their own behalf). We do not think the associational standing factors are intended to permit an association that has an interest against a challenged activity to obtain standing by adding a member who has individual standing to sue based on his own unrelated interest against the same activity. Therefore, SOS Alliance cannot satisfy the second prong of associational standing based on its members' environmental concerns, while satisfying the first prong solely based on certain members' unrelated concerns regarding their property values.

To establish standing based on its members' non-water-related concerns, then, SOS Alliance must show that *those* interests are germane to its purpose. According to its petition, SOS Alliance is "formed for the purpose of protecting the Edwards Aquifer with particular emphasis on preventing further pollution of Barton Springs and reversing the water quality degradation of Barton Springs that has already occurred." We are unpersuaded that increased time and danger for automobile travel, impaired viewing of the night sky, and decreased property value for landowners in the Barton Springs contributing and recharge zones is "germane to" SOS Alliance's purpose of reducing water pollution in Barton Springs. We recognize that SOS Alliance's mission to protect the water that feeds Barton Springs would generally result in opposition to developments in the contributing and recharge zones. According to the affidavit of SOS Alliance's communications director, "[a] significant amount of the activities of SOS Alliance are devoted to preventing or stopping governments from granting special favors to landowners and developers that facilitate destructive development in the recharge and contributing zones." It is equally apparent that a successful opposition to development can, in turn, benefit such interests as low traffic and low light levels for residents in the area. However, the fact that SOS Alliance's mission would benefit a member's interest does not mean that particular interest is included in—or germane to—SOS Alliance's purpose.[9]

---

[9] In fact, it appears more feasible that many of these members' interests as landowners might even be *contrary* to SOS Alliance's purpose. SOS Alliance would likely welcome declining property values if they would enable SOS Alliance to place more watershed land into long-term conservation easements, and would likely welcome inconveniences such as increased traffic and light if the result was surrounding areas becoming less desirable for home buyers and future real estate developers. Moreover, in the event that Mak Foster and Cypress Hays successfully develop their properties in accordance with the Development Agreements, we question whether SOS Alliance would subsequently seek to protect those developments' interests in increasing property values as well.

23

SOS Alliance refers to two federal cases in which members of an environmental organization had standing based on diminished property value resulting from the defendant's conduct. *See Laidlaw Envtl. Servs.*, 528 U.S. at 182-83; *Gaston Copper Recycling*, 204 F.3d at 156. Although neither case addresses the second prong of associational standing, we note that in both cases, the alleged decrease in property value was attributable to pollution by the defendant. *See Laidlaw Envtl. Servs.*, 528 U.S. at 182-83 (member "believed the pollutant discharges accounted for some of the discrepancy" in home value); *Gaston Copper Recycling*, 204 F.3d at 156 (member claimed "the pollution or threat of pollution has diminished the value of his property"). Therefore, in those cases, the interest of the members who had standing individually (combating the pollution that was lowering their property values) was germane to the purpose of the organization (combating pollution in general). Unlike in those cases, the SOS Alliance member who alleged a decrease in property value attributed the decrease solely to the fact that it was a "high-density development." SOS Alliance's members' concerns that neighboring high-density developments will cause artificial light sources to increase, road traffic to increase, and property values to decrease are not germane to SOS Alliance's mission to protect the Edwards Aquifer water. Therefore, SOS Alliance has not met the second prong of associational standing by alleging its members' concerns as landowners not related to Edwards Aquifer water.

We affirm the district court's granting of appellees' pleas to the jurisdiction as to SOS Alliance's claims that are not related to the Open Meetings Act.[10]

---

[10] In its second point on appeal, SOS Alliance contends that the district court erred in granting appellees' pleas to the jurisdiction based on the case not being ripe for adjudication as to any land that had not become subject to a finally approved plat, and based on the case being moot

24

*Sufficiency of City's Public Notices*

In its third point on appeal, SOS Alliance contends that the district court erred in granting summary judgment to appellees on SOS Alliance's cause of action under the Texas Open Meetings Act (the "Act"). In its petition, SOS Alliance alleged that the City's public notices regarding the Development Agreements failed to comply with the Act's requirement that the subject of a meeting be sufficiently set forth. Section 551.041 of the Act requires that a governmental body "give written notice of the date, hour, place, and *subject* of each meeting held by the governmental body." Tex. Gov't Code Ann. § 551.041 (West 2004) (emphasis added).

We review summary judgments de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Under the standard applicable to a traditional motion for summary judgment, the motion should be granted only when the movant establishes that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *See* Tex. R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). When both parties move for summary judgment and the trial court grants one party's motion and denies the other party's, as occurred in this case, the reviewing court should review both sides' summary judgment evidence and determine all questions presented. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). Thus, if the district court erred, we will reverse and render the judgment the court should have rendered. *Id.* In the event that the City's notices were insufficient under the Act, the City's actions taken in connection with the defective portions of the

as to land that was subject to a finally approved plat that SOS Alliance neither appealed nor challenged. Given that we have determined that the court does not have subject-matter jurisdiction based on standing, we need not consider the issues of ripeness or mootness.

25

notices are voidable. *See* Tex. Gov't Code Ann. § 551.141 (West 2004); *Point Isabel Indep. Sch. Dist. v. Hinojosa*, 797 S.W.2d 176, 182-83 (Tex. App.—Corpus Christi 1990, writ denied).

The public notice concerning the Cypress-Hays Development Agreement stated as follows:

> Consider Approving a Development Agreement with Cypress-Hays, L.P., including adopting Ordinance No. 1280.1 Designating a District under Section 42.044 of the Texas Local Government Code.

The public notice concerning the Mak Foster Development Agreement, posted ten days later, contained identical language, except that "Cypress-Hays, L.P." was replaced with "Mak Foster Ranch, L.P.," and "Ordinance No. 1280.1" was replaced with "Ordinance No. 1280.2." SOS Alliance complains that these notices insufficiently communicate the subject of the Development Agreements because they do not alert a member of the public to the Agreements' substantial impact—including thousands of homes, central water and wastewater systems, commercial development, and golf courses. Moreover, the notices do not refer to the property locations, the multiple variances from City ordinances,[11] or the time periods for which the Agreements could not be altered.

The Texas Supreme Court has noted that, under the notice requirements of the Act, "less than full disclosure is not substantial compliance." *Cox Enters., Inc. v. Board of Trs. of Austin Indep. Sch. Dist.*, 706 S.W.2d 956, 960 (Tex. 1986). However, the supreme court has also held

---

[11] SOS Alliance alleges that the Cypress-Hays Development Agreement contains more than 32 variances, including reduction of minimum lot size, reduction of minimum setbacks, and reduction of plat review and approval time.

26

that it is not necessary to "state all of the consequences which may necessarily flow from the consideration of the subject stated." *Texas Turnpike Auth. v. City of Fort Worth*, 554 S.W.2d 675, 676 (Tex. 1977).

We are guided by this Court's analysis in *Friends of Canyon Lake, Inc. v. Guadalupe-Blanco River Authority*, 96 S.W.3d 519 (Tex. App.—Austin 2002, pet. denied). In that case, this Court concluded that the following notice sufficiently described the applicable subject matter of the meeting:

> Water Purchase Contract among GBRA, CRWA, City of Cibolo, City of Marion, City of Schertz, ECWSC, GVSUD, SHWSC, & BMWD; Outline of Preliminary Agreement concerning joint participation in a treated water supply for portions of Comal, Kendall, & Bexar Counties.

96 S.W.3d at 530. The plaintiff complained that the notice was insufficient to inform the public that the river authority would seek to double the amount of water to which it was entitled on an annual basis, sell a portion of the water outside its ten-county area, and require the construction of $75 million in improvements. *See id.* This Court recognized that the notice "might not inform the casual reader of the precise consequences" of the agreements at issue, but held nonetheless that the notice was sufficiently descriptive to satisfy the Act. *See id.* at 531 (citing *Texas Turnpike Auth.*, 554 S.W.2d at 676).

In this case, like the notice at issue in *Friends of Canyon Lake*, the City's notices identified the applicable parties to the agreements and stated the type of agreement at issue—a development agreement. Moreover, just as the notice in *Friends of Canyon Lake* set out the counties affected without specifying the precise area, the notices here referenced

section 42.044 of the local government code, which governs the creation of "industrial districts" within a municipality's extraterritorial jurisdiction. *See* Tex. Loc. Gov't Code Ann. § 42.044(b) (West 2008). Section 42.044 also provides that the municipality's contract with a landowner in the industrial district can guarantee the district's immunity from annexation by the municipality "for a period not to exceed 15 years." *Id.* § 42.044(c)(1). Therefore, a reader of the notices would be informed that the subject of the meetings would include the potential approval of agreements with Mak Foster and Cypress Hays that involved development, on property in the City's extraterritorial jurisdiction, and potentially with restrictions lasting up to 15 years. The City was not obligated to state all the consequences that would flow from these Development Agreements. *See Texas Turnpike Auth.*, 554 S.W.2d at 676. Indeed, had the notices listed all the consequences that would follow from the Development Agreements, including the variances to be provided and the other issues highlighted by SOS Alliance, the result may have been to overwhelm, rather than inform, the reader. *See City of San Antonio v. Fourth Court of Appeals*, 820 S.W.2d 762, 766 (Tex. 1991) ("Far from serving the purposes of the Act, this degree of specificity would so overwhelm readers that it would prove even less informative than the current notice."); *see also Texas Turnpike Auth.*, 554 S.W.2d at 676 (not necessary to "post copies of proposed resolutions").

SOS Alliance argues that the notices' omission of the location or size of the property subject to the proposed Development Agreements is at variance from the City's standard notice practice. SOS Alliance relies on *River Road Neighborhood Ass'n v. South Texas Sports*, which found a notice insufficient under the Act based on "the well established custom and practice" of the governmental body. 720 S.W.2d 551, 557 (Tex. App.—San Antonio 1986, writ dism'd w.o.j.).

28

In that case, four public meetings had involved a similar subject matter, with the notices identifying

the purpose as "discussion/action." Because the notice for the fifth meeting stated only "discussion,"

the court held that the public was not properly alerted to the possibility that action would be taken.

*See id.* Here, however, SOS Alliance does not identify a "well established custom and practice"

applicable to development agreements. Instead, SOS Alliance refers to notice postings that involved

zoning decisions. The Development Agreements do not involve zoning. *Cf.* Tex. Loc. Gov't Code

Ann. § 212.003(a) (West 2008) (restricting municipality's ability to regulate in its extraterritorial

jurisdiction). With no other public notice posting related to development agreements with the City

in the record, SOS Alliance has not shown any well-established custom and practice that would be

relevant to the notices' sufficiency.[12]

SOS Alliance also argues that a more detailed description of the subject matter was

required because of the "high level of public interest in these developments." To show a heightened

public interest, SOS Alliance relies on affidavits of residents in the extraterritorial jurisdiction

who assert that they were among many citizens who attended subsequent city council meetings

to raise their concerns regarding the Development Agreements. Even assuming SOS Alliance has

demonstrated a heightened public interest, we are not convinced that the notices' description of

subject matter should be deemed insufficient as a result. In *Cox Enterprises*, the Texas Supreme

Court held that, taking into account an increased level of public interest, the bare description

---

[12] In fact, given that the Development Agreements were apparently without precedent as to the City (SOS Alliance itself describes the developments as "unprecedented in size and density for Dripping Springs"), it appears that the City actually followed its usual custom and practice. The second notice—for the Mak Foster Development Agreement—was essentially identical to the first notice—for the Cypress Hays Development Agreement.

29

"personnel" was insufficient to describe the selection of a new school superintendent and the description "litigation" was insufficient to describe "a major desegregation lawsuit which has occupied the Board's time for a number of years, and whose effect will be felt for years to come." 706 S.W.2d at 959. The City's notices in this case are much more detailed than those in *Cox Enterprises*. The City's notices state the parties involved, the type of agreement at issue, that the extraterritorial jurisdiction would be impacted (based on the statute included in the notice), and that the agreements might be approved as a result of the meeting. A reader interested in development in the City's extraterritorial jurisdiction would have had sufficient notice that the City was considering action relevant thereto. *See Fourth Court of Appeals*, 820 S.W.2d at 766; *Rettberg v. Texas Dep't of Health*, 873 S.W.2d 408, 411 (Tex. App.—Austin 1994, no writ) ("notice is sufficient under the Act when it alerts a reader that some action will be taken relative to a topic").

Having concluded that the notices were sufficiently descriptive so as to state the subjects of the meetings in accordance with section 551.041 of the Open Meetings Act, we overrule SOS Alliance's third point on appeal.[13]

### Attorneys' Fees

In its remaining points on appeal, SOS Alliance asserts that, even if we affirm the trial court's granting of appellees' pleas to the jurisdiction and motions for summary judgment,

---

[13] Appellees argue that any potential violations of the Act were validated by the legislature in 2003. *See* Tex. Loc. Gov't Code Ann. § 212.172(h) (West 2008) ("An agreement between a municipality and a landowner entered into prior to the effective date of this section and that complies with this section is validated."). Because we conclude that SOS Alliance has not shown a violation of the Act, we need not address this argument.

the district court erred in awarding attorneys' fees to Mak Foster.[14]  In a proceeding under the

Uniform Declaratory Judgments Act, a court may award "reasonable and necessary attorney's fees

as are equitable and just." Tex. Civ. Prac. & Rem. Code Ann. § 37.009.  A trial court's award of

attorneys' fees under the UDJA is reviewed for an abuse of discretion. *See Bocquet v. Herring*,

972 S.W.2d 19, 20-21 (Tex. 1998).  A trial court abuses its discretion by awarding fees when there

is insufficient evidence that the fees were reasonable and necessary, or when the award is inequitable

or unjust. *Id.* at 21.

As an initial matter, SOS Alliance argues that Mak Foster failed to segregate between

its defense of claims for which recovery of attorneys' fees was proper and those for which such

recovery was not proper. *See West Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 267

(Tex. App.—Austin 2002, no pet.).  However, SOS Alliance fails to provide a reason for which any

of its particular claims independently would not provide a valid basis for Mak Foster's recovery of

attorneys' fees.  Regarding its Open Meetings Act claim, SOS Alliance refers to section 551.142 of

the Act, which permits a court to award the defendant reasonable attorneys' fees in an action by

mandamus or injunction regarding a potential violation of the Act, provided that the court consider

whether the action was brought in good faith. *See* Tex. Gov't Code Ann. § 551.142 (West 2004).

According to its petition, however, SOS Alliance brought its Open Meetings Act claim as an action

under the UDJA, not as an action by mandamus or injunction under section 551.142. *See* Tex. Civ.

Prac. & Rem. Code Ann. § 37.004(a).  Regarding its other claims, SOS Alliance questions whether

the district court had jurisdiction to award attorneys' fees that were incurred in connection with

---

[14]  Due to a partial settlement between SOS Alliance and the City, SOS Alliance does not seek appellate review of the attorneys' fees awarded to the City.

31

claims over which the court determined it had no subject-matter jurisdiction. The district court did have this authority.[15] *See id.* § 37.009 (court may award attorneys' fees in *any* proceeding under the UDJA); *Galveston County Comm'rs' Court v. Lohec*, 814 S.W.2d 751, 755 (Tex. App.—Houston [14th Dist.] 1991) (op. on reh'g) (court may award attorneys' fees incurred in defense of UDJA claims brought by party without standing), *rev'd on other grounds*, 841 S.W.3d 361 (Tex. 1992).

SOS Alliance also argues that Mak Foster failed to segregate between its defense of claims asserted by SOS Alliance and those asserted by Friendship Alliance, the co-plaintiff that settled with appellees. "A party seeking attorney fees has a duty . . . to segregate the fees owed by different parties." *See French v. Moore*, 169 S.W.3d 1, 17 (Tex. App.—Houston [14th Dist.] 2004, no pet.). There is no duty to segregate, however, when the causes of action are dependent upon the same set of facts or circumstances and are intertwined to the point of being inseparable. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 11 (Tex. 1991). Mak Foster relies on SOS Alliance's motion to consolidate to show that the claims asserted by the co-plaintiffs were intertwined,[16] but that motion is not in the appellate record. Similarly, Friendship Alliance's petition is not in the record for our review. We are limited to the appellate record provided. *See* Tex. R.

---

[15] Neither of the cases cited by SOS Alliance suggests otherwise. In *Gregg County Appraisal District v. Laidlaw Waste Systems, Inc.*, the statute at issue allowed attorneys' fees for a property owner who prevailed in his tax appeal. 907 S.W.2d 12, 21 (Tex. App.—Tyler 1995, writ denied). To the extent the trial court did not have jurisdiction over the owner's claims, he did not "prevail" and, therefore, by statute was not entitled to attorneys' fees. *Id.* In *Lipshy Motorcars, Inc. v. Sovereign Associates, Inc.*, 944 S.W.2d 68 (Tex. App.—Dallas 1997, no writ), an *appellate* court determined it had no jurisdiction to consider a motion for sanctions and attorneys' fees against an appellant who attempted to appeal a non-appealable interlocutory order. 944 S.W.2d at 70-72.

[16] According to Mak Foster, SOS Alliance represented in its motion to consolidate that the plaintiffs' lawsuits were "based on identical facts and circumstances," asked for "identical declaratory and nearly identical injunctive relief," and were based on "identical legal grounds."

App. P. 34.1; *Merchandise Ctr., Inc. v. WNS, Inc.*, 85 S.W.3d 389, 394 (Tex. App.—Texarkana 2002, no pet.) ("Materials outside the record . . . that are improperly included in or attached to a party's brief . . . may not be considered by an appellate court in its review of the appeal on its merits."). However, our review of what the record does contain gives us no reason to conclude that Friendship Alliance's lawsuit did not involve the same set of facts and circumstances. *See Enterprise Leasing Co. v. Barrios*, 156 S.W.3d 547, 550 (Tex. 2004) ("If the pertinent summary judgment evidence considered by the trial court is not included in the appellate record, an appellate court must presume that the omitted evidence supports the trial court's judgment."). We conclude that Mak Foster had no duty to segregate the fees owed by the co-plaintiffs.

Next, SOS Alliance asserts that the evidence is insufficient to support an award of attorneys' fees in the amount requested by Mak Foster. As a general rule, the party seeking to recover attorneys' fees carries the burden of proof. *Stewart Title Guar. Co.*, 822 S.W.2d at 10. Whether an award of attorneys' fees is reasonable and necessary is a fact question. *Bocquet*, 972 S.W.2d at 21. SOS Alliance contends that Mak Foster's evidence of attorneys' fees "consists entirely of the conclusory, self-serving, affidavit[] of lead counsel[]." However, contrary to SOS Alliance's contention, that affidavit sets out the attorneys who performed the work, the number of hours billed by each, their hourly rates, and a description of the tasks for which legal services were performed. The affiant stated his qualifications and experience, and averred that:

> I am familiar with usual and customary rates charged by attorneys in the area for cases with comparable complexity and amounts in controversy, and the fees described above are those customarily charged in this area for the same or similar services by those with similar experience, reputation, and ability, considering the type

33

of controversy, the time limitations imposed, the work involved, the results obtained and length of the firm's relationship with Mak Foster.

SOS Alliance suggests that only fee bills with unredacted entries would be sufficient evidence of attorneys' fee amounts, but does not base its position on any legal authority. We conclude that the evidence was sufficient to show Mak Foster's attorneys' fees were reasonable and necessary. *See Texas Commerce Bank v. New*, 3 S.W.3d 515, 517-18 (Tex. 1999) (affidavit testimony in support of attorneys' fees legally sufficient where attorney detailed the services rendered and testified he was duly licensed attorney, he was familiar with usual and customary attorneys' fees in locality, and the fees sought were reasonable); *Brockie v. Webb*, 244 S.W.3d 905, 909-10 (Tex. App.—Dallas 2008, pet. denied) ("Generally, the nature and extent of the attorney's services are expressed by the number of hours and the hourly rate.").

SOS Alliance also contends that the attorneys' fees amount awarded to Mak Foster—$86,200—is "inequitable and unjust under the circumstances of this case for a nonprofit organization dedicated to the public good." Similar arguments were stated by amicus curiae, who expressed concern that "full fee awards for bringing environmental and open government claims" are a "threat of financial intimidation" that "can only have a chilling effect on the ability of community organizations to bring citizen suits on behalf of their members." We review whether attorneys' fees awarded under the UDJA are equitable and just under an abuse of discretion standard. *See Bocquet*, 972 S.W.2d at 21. An award can be inequitable or unjust even when the fees are reasonable and necessary. *See id.* However, when reviewing matters committed to the trial court's discretion, an appellate court may not substitute its judgment for that of the trial judge,

34

and a trial court does not abuse its discretion merely because it decides a discretionary matter differently than the appellate court would under similar circumstances. *Baylor Univ. Med. Ctr. v. Rosa*, 240 S.W.3d 565, 569 (Tex. App.—Dallas 2007, pet. denied). The test for an abuse of discretion is whether the court acted without reference to guiding rules and principles. *See Cire v. Cummings*, 134 S.W.3d 835, 838-39 (Tex. 2004).

To show that the attorneys' fees award was not just and equitable, SOS Alliance relies on its being a "nonprofit organization dedicated to the public good" and the "significance of the matters at stake in this lawsuit and that SOS Alliance was at least somewhat successfully addressed." We do not consider this, standing alone, to make the award of attorneys' fees to Mak Foster inequitable or unjust. It may very well have been equitable and just for the district court *not* to have awarded fees or to award some other amount, but that does not make this award inequitable or unjust. *See Save Our Springs Alliance, Inc. v. Lazy Nine Mun. Util. Dist.*, 198 S.W.3d 300, 318-19 (Tex. App.—Texarkana 2006, pet. denied) (holding that trial court did not abuse its discretion in awarding attorneys' fees to defendant in UDJA action, even though SOS Alliance was "a local nonprofit organization," because "reasonable minds can differ concerning whether the attorney's fees are just and equitable"). The award was a matter of the district court's discretion, and we do not consider the court to have abused its discretion in reaching the decision it did.

Having concluded that the district court did not err in awarding attorneys' fees to Mak Foster, we overrule SOS Alliance's remaining points on appeal.

*Conclusion*

The judgment of the district court is affirmed.

_____

G. Alan Waldrop, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop;
 Chief Justice Law Not Participating

Affirmed

Filed: July 3, 2009